*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

WILLIAM DALE GAULT,

Defendant-Appellant.

UNPUBLISHED
August 08, 2025
9:58 AM

No. 367328
St. Clair Circuit Court
LC No. 22-002413-FH

Before: PATEL, P.J., and RIORDAN and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of possession with intent to deliver methamphetamine, second offense, MCL 333.7401(2)(b)(*i*); maintaining a drug house, second offense, MCL 333.7405(1)(d); and possession of a controlled substance analog (possession of analogs), second offense, MCL 333.7403(2)(b)(*ii*).[1] The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 15 to 30 years for the conviction of possession with intent deliver methamphetamine, and 10 to 15 years for each conviction of maintaining a drug house and possession of analogs. We affirm.

## I. FACTUAL OVERVIEW

Defendant's convictions arise from the discovery of methamphetamine and analogs during the execution of a search warrant at 718 Erie Street, Apartment 2, in Port Huron on October 20, 2022. The prosecution presented evidence that the St. Clair Drug Task Force (DTF) conducted a three-month investigation regarding defendant being in possession of methamphetamine in the apartment. Defendant did not rent the one-bedroom apartment, which belonged to his mother, but had been staying in the small bedroom. During the execution of the search warrant, defendant was found in the bedroom, along with his friend, Jaclynn Manke, who was visiting defendant. In the bedroom, the DTF members found, *inter alia*, a digital scale, methamphetamine, pills, and a large

---

[1] The jury was unable to reach a verdict on an additional charge of witness intimidation, MCL 750.122(7)(b), and the prosecution dismissed the charge.

-1-

sum of currency. Also inside the bedroom was defendant's wallet, identification, and credit cards, all of which were in close proximity to the location of some of the narcotics and the currency. Manke testified that, during the months leading up to the search, she frequently had used her vehicle to assist defendant in transporting and delivering methamphetamine, and saw defendant with methamphetamine on the day of the raid. At trial, the defense asserted that there was an insufficient nexus between defendant and the items found in the apartment because defendant was not staying in the apartment on October 20, 2022. Nonetheless, the jury found defendant guilty as previously noted.

## II. MOTION TO SUPPRESS - INVALID SEARCH WARRANT

Defendant first argues that the trial court erred by denying his motion to suppress the evidence seized during the search of the apartment because the search warrant was invalid. We disagree.

"A trial court's findings on a motion to suppress evidence as illegally seized will not be reversed on appeal unless clearly erroneous, while questions of law and the decision on the motion are reviewed de novo . . . ." *People v James*, 327 Mich App 79, 90; 932 NW2d 248 (2019) (quotation marks and citation omitted). "A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court has made a mistake." *Id*. "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *People v Unger*, 278 Mich App 210, 243; 749 NW2d 272 (2008) (quotation marks and citations omitted). When reviewing a magistrate's determination whether probable cause was established to support a search warrant, we ask "only whether a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause." *Id*. at 243-244 (quotation marks and citation omitted).

"Both the United States Constitution and the Michigan Constitution guarantee the right of the people to be free from unreasonable searches and seizures." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2020). Search warrants must be supported by probable cause in order to justify the search. US Const, Am IV; Const 1963, art 1, § 11. "Probable cause exists when the facts and circumstances would allow a reasonable person to believe that the evidence of a crime or contraband sought is in the stated place." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). "If the search warrant is supported by an affidavit, the affidavit must contain facts within the knowledge of the affiant and not mere conclusions or beliefs." *People v Martin*, 271 Mich App 280, 298; 721 NW2d 815 (2006). "The affiant may not draw his or her own inferences, but rather must state matters that justify the drawing of them." *Id*. "However, the affiant's experience is relevant to the establishment of probable cause." *Waclawski*, 286 Mich App at 698.

Under MCL 780.653(b), probable cause may be based upon information supplied by an unnamed individual if there are "affirmative allegations from which the judge or district magistrate may conclude that the person spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable." "The personal knowledge element should be derived from the information provided or material facts, not merely a recitation of the informant's having personal knowledge." *People v Stumpf*, 196 Mich App 218, 223; 492 NW2d 795 (1992). "If personal knowledge can be inferred from the stated facts, that is sufficient

to find that the informant spoke with personal knowledge." *Id*. An independent police investigation that verifies information provided by an informant can also support issuance of a search warrant. *Waclawski*, 286 Mich App at 699.

In this case, the affidavit was authored by United States Border Patrol Agent Thomas O'Rourke, who was assigned to the DTF and had "attended various training schools in reference to drug interdiction and other narcotics related matters." Agent O'Rourke averred that he had been involved in investigating illegal controlled substance activities in St. Clair County for more than 20 years, and had been involved in "numerous illegal narcotics related arrests." The affiant averred that the confidential informant was "credible and reliable." He averred that the informant "has provided members of the DTF with information related to local drug dealers," and has "provided information about locations throughout the County of St. Clair that were involved in receiving and distributing illegal controlled substances." Agent O'Rourke averred that "[t]hrough personal knowledge and/or DTF independent investigation, the information has proven to be both current and accurate." Thus, Agent O'Rourke specifically cited the informant's reliability, see *Stumpf*, 196 Mich App at 223, and his experience, which was relevant to the establishment of probable cause, *Waclawski*, 286 Mich App at 698.

Further, Agent O'Rourke explained how the DTF's independent investigation supported the information provided by the informant, which defendant minimizes. See *id*. at 699. In August 2022, the DTF received information from an informant that defendant was "selling illegal controlled substances out of" "718 Erie Street, # 2 (Peru Village), City of Port Huron . . . ." The informant identified defendant by first name, "Will"; identified defendant from a photograph; reported that "he/she . . . purchases controlled substances from" defendant; and reported that "he/she had observed [defendant] to be in possession of quantities at the above described and sought to be searched location." Within 30 days of the execution of the warrant, the informant informed the DTF that "he/she could purchase a quantity of illegal substance" from defendant, and, as a result, the DTF members arranged a controlled buy. After being "issued a quantity of pre-recorded DTF buy funds," the informant went to the "pre-determined meet location," left the location "[a]fter a short period of time," "responded directly back to a member of the DTF and turned over a quantity of suspected illegal controlled substance." The informant informed the DTF members that "he/she had purchased the illegal controlled substance" from defendant at the meet location. DTF members followed defendant when he left 718 Erie Street, and "responded directly to the pre-determined meet location." Agent O'Rourke averred that, on the basis of his training and experience, "the substance purchased did have the same nature and consistency as the illegal controlled substance sought to be obtained during the controlled buy."

Subsequently, 36 hours before the execution of the warrant, "a member of the DTF was contacted by a credible and reliable confidential informant who advised that he/she could purchase a quantity of illegal controlled substance from" defendant, and, as a result, the DTF members arranged another controlled buy. After being "issued a quantity of pre-recorded DTF buy funds," the informant went to the meet location, left the location "[a]fter a short period of time," "responded directly back to a member of the DTF and turned over a quantity of suspected illegal controlled substance." The informant informed the DTF members that "he/she had purchased the illegal controlled substance" from defendant at the meet location. Before the transaction, DTF members "maintained surveillance" at 718 Erie Street, and observed defendant "exit . . . and respond directly to the meet location and make contact with" the informant. Agent O'Rourke

averred that, on the basis of his training and experience, "the substance purchased had the same packaging," and "the same nature and consistency as the illegal controlled substance sought to be obtained during the controlled buy." The fact that there were two successful controlled buys supports the determination that the confidential informant was reliable. See *People v Head*, 211 Mich App 205, 209; 535 NW2d 563 (1995).

Given the information contained in the search warrant affidavit, which included information on the basis of the DTF's independent investigation, the affidavit clearly contained "affirmative allegations" to show that the informant "spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable." MCL 780.653(b). Further, the informant indicated that defendant was in possession of illegal controlled substances inside Apartment 2, and the DTF's subsequent surveillance revealed that for two controlled buys, defendant left the building with a controlled substance, sold it, and then returned to the building. Considering the information provided by the informant, who was shown to be reliable, and the DTF's independent investigation, it was reasonable for the magistrate to infer that, even though defendant was not seen leaving and reentering Apartment 2 itself—only the main door to building—before and after the controlled buys, "the facts and circumstances would allow a reasonable person to believe that the . . . contraband sought" would be found in Apartment 2. *Waclawski*, 286 Mich App at 698. As a result, defendant's challenge to the validity of the search warrant was meritless. Therefore, the trial court did not err by denying his motion to suppress the evidence seized during the search.

## III. CLOSURE OF THE COURTROOM

Defendant argues that the trial court violated his constitutional right to a public trial when it removed three of his supporters, one of whom was defendant's minor son, from the courtroom during jury selection and for the duration of the trial. Again, we disagree.

To preserve a constitutional issue, "a party must raise it before the trial court." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). Because defendant did not object when the trial court removed three spectators from the courtroom, we review this unpreserved claim for plain error affecting defendant's substantial rights. *People v Vaughn*, 491 Mich 642, 663-664; 821 NW2d 288 (2012). An error is plain if it is "clear or obvious." *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018) (quotation marks and citation omitted). "Substantial rights are affected when the defendant is prejudiced, meaning the error affected the outcome of the trial." *People v Jones*, 297 Mich App 80, 83; 823 NW2d 312 (2012). "The reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Thorpe*, 504 Mich 230, 252-253; 934 NW2d 693 (2019). The defendant has the burden of establishing entitlement to relief under plain-error review. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Both the federal and state constitutions guarantee criminal defendants the right to a public trial. US Const, Am VI; Const 1963, art 1, § 20; *People v Davis*, 509 Mich 52, 66; 983 NW2d 325 (2022). The public trial requirement is for an accused's benefit, allowing the public to see that he has received fair treatment and has not been unjustly condemned. *Davis*, 509 Mich at 66. The presence of interested spectators may keep jurors keenly attuned to a sense of responsibility and to the importance of their functions. *Id*. "The public-trial right also helps ensure that judges and

prosecutors fulfill their duties ethically, encourages witnesses to come forward, and discourages perjury." *Id*. "Despite serving these important interests, the public trial right is not unlimited, and circumstances may exist that warrant the closure of a courtroom during any stage of a criminal proceeding." *Id*. "In order to justify a courtroom closure, there must be an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. (quotation marks and citations omitted).

There is a distinction between partially and fully closing courtrooms to the public. A total closure involves excluding all persons from the courtroom for some period, while a partial closure involves excluding one or more individuals, but not all, from the courtroom. *United States v Simmons*, 797 F3d 409, 413 (CA 6, 2015).[2] "[T]he effect of a partial closure of trial does not reach the level of a total closure and only a substantial, rather than compelling reason for the closure is required." *People v Russell*, 297 Mich App 707, 720; 825 NW2d 623 (2012).

This issue before us only involves a partial closure because just three spectators were prevented from attending defendant's trial. The courtroom was not totally closed to the public. In any event, a substantial reason was necessary for the partial closure. *Id*. The record establishes a substantial—and even compelling—reason for the courtroom closure, namely, the avoidance of jury tampering. Additionally, the closure did not unnecessarily interfere with defendant's right to a public trial. On the first day of trial, before jury selection commenced, the jury pool was seated in the gallery of the courtroom. Following the trial court's preliminary instructions, the trial court had to excuse the jury pool to address the behavior of two women and defendant's minor son. The trial court expressed its concern that the women had loud conversations "on more than one occasion," which the prospective jurors overheard, and that profanity was used. The women acknowledged having these conversations, using profanity, and negatively discussing a key prosecution eyewitness, Manke.[3] The trial court explained that prospective jurors reported hearing the women's commentary, and "at least one other juror" felt "uncomfortable."

This circumstance, the prevention of jury tampering, was sufficient to justify partially closing the courtroom to just the three spectators to protect the integrity of the judicial system. See *United States v Cervantes*, 706 F3d 603, 612-613 (CA 5, 2013) (explaining that "the magistrate judge presented multiple substantial reasons for partially closing voir dire and detailed those reasons on the record," including having "serious concerns about the panel members' comfort and safety given the nature of the case," such that "if jurors did not feel comfortable enough to fully and honestly answer the court's questions, then the court would be unable to empanel an impartial jury").

---

[2] Although we may find decisions of federal circuit courts persuasive, we are not bound by them. See *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[3] While defendant's minor son acknowledged only hearing the conversations and not participating in them, the prosecutor noted that the women were his "ride." Defendant does not separately address his minor son also being removed from the courtroom.

Defendant argues that the trial court failed to consider any alternatives to removing the three persons from the courtroom, for example, giving a warning that "future loud conversations would result in removal," or moving "the three spectators farther away from the jury venire." The trial court, however, directly addressed the distraction they created in the courtroom, as the judge was "afraid that [the behavior] is going to happen again." The trial court also explained that the spectators' behavior "already had an effect on jurors," and that the court did not "want anybody who ends up being on that jury feeling that they are being intimidated in any way shape or form [by these spectators] or that anyone is trying to influence them." The trial court stated that the spectators' interruptions in the proceedings in this manner amounted to interference "with the administration of justice."

Given the circumstances the three created and the trial court's narrowly tailored response, defendant has failed to establish that the limited closure of the courtroom to three spectators was plain error that affected his substantial rights.

## IV. DRUG PROFILE EVIDENCE

Defendant next argues he is entitled to a new trial because the trial court plainly erred when it allowed two law enforcement witnesses, Agent O'Rourke and Port Huron Police Officer Brian Daly, to offer improper drug profile testimony that the "innocuous set of scribbled numbers on a slip of paper" found during the search of the residence was a drug ledger. While we agree that the officers' testimony in this regard was improper, we disagree that defendant is entitled to a new trial.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *Thorpe*, 504 Mich at 252. As defendant acknowledges, he did not object to the challenged testimony, leaving his evidentiary claim unpreserved, and we therefore review this claim for plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

Although drug profile evidence may be admissible as background or modus operandi evidence, it is not admissible as substantive evidence of a defendant's guilt:

> Drug profile evidence has been described as an informal compilation of characteristics often displayed by those trafficking in drugs. A profile is simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity. Drug profile evidence is essentially a compilation of otherwise innocuous characteristics that many drug dealers exhibit, such as the use of pagers, the carrying of large amounts of cash, and the possession of razor blades and lighters in order to package crack cocaine for sale. Such evidence is inherently prejudicial to the defendant because the profile may suggest that innocuous events indicate criminal activity. In other words, these characteristics may not necessarily be connected to or inherently part of the drug trade, so that these characteristics could apply equally to innocent individuals as well as to drug dealers. It is for this reason that the majority of courts have held that drug profile evidence is inadmissible as substantive evidence of guilt, because proof of crime based wholly

-6-

or mainly on these innocuous characteristics could potentially convict innocent people. [*People v Murray*, 234 Mich App 46, 52-53; 593 NW2d 690 (1999) (quotation marks and citations omitted).]

In *Murray*, this Court concluded that it was error to permit a police officer to testify, on the basis of his general knowledge of drug dealing, that "a piece of paper with tabulations of numbers found on the dining-room table was used to keep track of drug sales." *Id*. at 63. This Court held that this testimony "impermissibly linked a fairly innocent piece of paper to the drug trade in such a manner that defendant's guilt was implied from the profile itself." *Id*. at 63-64. Nevertheless, this Court concluded that the defendant was not entitled to a new trial because admission of this testimony was harmless given the strong circumstantial evidence that "pointed to defendant's guilt." *Id*. at 64.

Similarly, in this case, we agree with defendant that the testimony regarding the seizure of a "drug ledger" was improper drug profile evidence. Agent O'Rourke and Officer Daly both testified that a sheet of paper bearing some tabulations of numbers found in defendant's bedroom during the search was a drug ledger. Agent O'Rourke also testified that the paper had "amounts on it looks . . . like an amount owed, if you will," and then Agent O'Rourke answered affirmatively when the prosecutor asked if the agent would "photograph . . . it to preserve suspected quantities[.]" The officers' testimony constituted plain error because it was clearly or obviously improper. See *Carines*, 460 Mich at 763. Although Agent O'Rourke properly testified that a drug ledger may be indicative of "dealer activity," he and Officer Daly then both testified that the piece of paper recovered from defendant's bedroom during the search was in fact a drug ledger. See *Murray*, 234 Mich App at 57. Because the testimony necessarily implied defendant's guilt, its admission was plain error.

However, defendant is not entitled to a new trial because he cannot show that the error affected his substantial rights, i.e., that the error affected the outcome of the proceedings. *Jones*, 297 Mich App 83. Stated differently, the testimony that the piece of paper seized during the search was a drug ledger was of comparatively minor importance considering the totality of the admissible evidence against defendant. There was evidence that on the day that the search warrant was executed, defendant was staying in the small bedroom of his mother's one-bedroom apartment. In that bedroom, DTF members found, *inter alia*, a digital scale, baggies of methamphetamine, baggies containing analogs, and a large amount of currency. Also inside the bedroom were men's clothes and a man's watch, which defendant's mother identified as belonging to defendant. Defendant's wallet that contained his identification and credit cards was found in very close proximity to the location where some of the narcotics and the currency were found. The largest package of methamphetamine seized weighed 13.86 grams. In addition, defendant's mother, who testified for the prosecution, indicated that she suspected defendant was selling drugs. Another prosecution witness, Manke, who was with defendant in the bedroom when the raid occurred, testified that, during the months leading up to the search, she frequently had used her vehicle to assist defendant in transporting and delivering methamphetamine, and she saw defendant with methamphetamine on the day of the raid. In addition, during recorded jail calls, defendant admitted that he had sold methamphetamine to certain individuals. In sum, given the admissible evidence regarding defendant's guilt of the charges against him, the challenged testimony was of little consequence.

In a related claim, defendant argues that defense counsel was ineffective for failing to object to the improper testimony. Because defendant did not raise a claim that defense counsel was ineffective for failing to object to the officers' testimony in a motion for a new trial or request for an evidentiary hearing, or by moving to remand for an evidentiary hearing, our review of this claim is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). We review for clear error a trial court's factual findings, and questions of constitutional law are reviewed de novo. *People v Shaw*, 315 Mich App 668, 671-672; 892 NW2d 15 (2016). "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id.* The effective assistance of counsel is presumed, and the burden is on the defendant to establish the contrary. *People v Roscoe*, 303 Mich App 633, 644; 846 NW2d 402 (2014).

In this case, because the officers' testimony was improper drug profile evidence, defense counsel's failure to object to the evidence was not objectively reasonable. See *Nix*, 301 Mich App at 207. However, given the strength of the other evidence presented at trial, there is no reasonable probability that the improper evidence affected the outcome of the trial. Therefore, defendant has not demonstrated that he was prejudiced by defense counsel's inaction. *Id.* Consequently, defendant has not established that he was denied the effective assistance of counsel.

## V. RIGHT OF ALLOCUTION

In his last claim, defendant argues that he is entitled to be resentenced because the trial court violated his right of allocution. We disagree.

A defendant must object to the trial court's alleged interference with his right of allocution at sentencing to properly preserve the issue for appeal. See *People v Bailey*, 330 Mich App 41, 66; 944 NW2d 370 (2019). Because defendant did not raise this claim at sentencing, we review this unpreserved claim for plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

MCR 6.425(D)(1)(c), at the time relevant to this case, required the court to give a defendant "an opportunity to advise the court of any circumstances they believe the court should consider in imposing sentence[.]"[4] The purpose of the right to allocution is to allow a defendant "to speak in mitigation of the sentence," *People v Petty*, 469 Mich 108, 119; 665 NW2d 443 (2003), and thus to "ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence," *id.* at 119 n 7, quoting *Black's Law Dictionary* (7th ed) (quotation marks omitted). If the trial court fails to comply with this rule, resentencing is required. *Petty*, 469 Mich at 121. We have found that a defendant is deprived of "a meaningful opportunity

---

[4] MCR 6.425(D)(1)(c) has since been amended, but the underlying right of allocution remains unchanged.

for allocution" where the trial court interrupts and imposes sentence as soon as the defendant begins speaking, *Bailey*, 330 Mich App at 67, or interrupts the defendant on multiple occasions as he continues to speak, see *People v Dixon-Bey*, 340 Mich App 292, 302-303; 985 NW2d 904 (2022). "[A] single interruption, where a defendant otherwise receives a reasonable opportunity to speak, does not deprive the defendant of the right of allocution." *Id*. at 302. "It [also is] appropriate for the court to interrupt for the purpose of seeking clarification of a defendant's statements." *Id*. "However, allocution is the *defendant's* opportunity to *address the court*, not the court's opportunity to conduct an interrogation or deliver a lecture." *Id*. After allocution and during sentencing, the trial court may deliver a lecture or express disbelief but must first permit the defendant a meaningful opportunity to speak. *Id*.

Contrary to defendant's characterization of what transpired at sentencing, the record clearly illustrates that the trial court did not "high jack[]" his right of allocution. Defendant faults the trial court for interrupting him three times. However, the trial court's "interruptions" did not intimidate defendant or stop him from addressing the court further. See *id*. at 300-302. The initial interruption was benign because it appears that the trial court did not hear defendant, i.e., was requesting defendant to repeat himself, which defendant did. Defendant asked the trial court to show mercy on him. After defendant made this request, the trial court asked defendant, "Why?" Even if this could be considered as the second interruption, it was not inappropriate for the trial court to question defendant to seek clarification for defendant's request for mercy. *Id*. at 302. Defendant then explained to the court why he was asking for mercy, which was because he "[had not] given up on [himself] yet." Again, the trial court sought elucidation for defendant's response. Defendant responded to the trial court, expressing his choice to not "talk too much." Subsequently, the trial court provided defendant another opportunity to address the trial court, and defendant apologized. In sum, although the trial court asked defendant two questions for clarification during his allocution, the court clearly paused and listened to afford defendant the opportunity to address the court. Furthermore, the record is clear that the trial court properly did not lecture defendant until after defendant was done speaking and the court was imposing sentence. *Id*. Given this record, the trial court did not plainly err by violating MCR 6.425(D)(1)(c), and defendant is not entitled to be resentenced.

## VI. CONCLUSION

There were no errors warranting relief. We affirm.

/s/ Sima G. Patel
/s/ Michael J. Riordan
/s/ Brock A. Swartzle